Filed 1/19/23  P. v. Miller CA6
Opinion following transfer from Supreme Court
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>EDWARD MILLER,<br><br>    Defendant and Appellant. | H048932<br>(Santa Clara County<br>Super. Ct. No. 150722) |

In 1993, a jury convicted defendant Edward Miller of first degree felony murder (Pen. Code, §§ 187, 189),[1] robbery (§ 211), and kidnapping (§ 207), finding true the felony-murder special circumstance allegations that the murder was committed during a robbery and a kidnapping (former § 190.2, subd. (a)(17)(i), (ii))[2] and the allegation that defendant personally used a deadly or dangerous weapon during the commission of the murder and the robbery (§ 12022, subd. (b)).  The superior court sentenced defendant to life without the possibility of parole.  In 1994, this court affirmed the judgment in case No. H011204.[3]

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Currently section 190.2, subdivision (a)(17)(A) and (B).

[3] We previously granted defendant's request for judicial notice of this court's opinion in case No. H011204.  (See Evid. Code, § 452.)

In 2021, defendant filed a petition for resentencing pursuant to former section 1170.95 (now section 1172.6), which was enacted by the Legislature through its passage of Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437). (Stats. 2018, ch. 1015, § 4.) As relevant here, former section 1170.95 allowed individuals convicted of felony murder to petition the superior court to vacate the conviction under recent changes to the law that limited the scope of the felony murder rule to individuals who were major participants in the underlying felony and acted with reckless indifference to human life. The superior court denied the petition, determining that "readily ascertainable facts from the record show [defendant] is ineligible for relief as a matter of law" based on the jury's felony-murder special circumstance findings and this court's decision in the direct appeal to uphold the findings despite an instructional error. In the direct appeal, this court determined that there was "ample evidence that defendant participated in all aspects of the underlying crimes, was a major participant in the murder, and acted with a reckless indifference to human life,"[4] such that the trial court's failure to instruct the jury that it must find defendant was a major participant in the underlying felony and acted with reckless indifference to human life was harmless beyond a reasonable doubt.

Defendant contends that the superior court erred in denying his petition because it relied on the record of conviction to deny the petition without first appointing him counsel. Defendant also contends that the superior court erred in determining that defendant was ineligible for relief as a matter of law because this court's decision to uphold the felony-murder special circumstance findings was rendered before the California Supreme Court's rulings in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and

---

[4] The felony-murder special circumstance statute required individuals who were not the actual killer and did not act with the intent to kill to be major participants in the underlying *felony* and act with reckless indifference to human life, as the statute does today. (See former § 190.2, subd. (a)(17); § 190.2, subd. (a)(17), (d).)

*People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), which construed the felony-murder special circumstance statute.

We originally reversed the superior court's order denying defendant's former section 1170.95 petition. The California Supreme Court granted review and held this case pending its decision in *People v. Strong* (2022) 13 Cal.5th 698 (*Strong*). After it decided *Strong*, it remanded this case for reconsideration in light of *Strong*. The parties now agree that reversal is required. We conclude that *Strong* requires us to reverse the court's order and remand with directions to appoint counsel and consider whether to issue an order to show cause.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Factual Background*[5]

"Defendant was convicted of murdering Gonzalo Romero, whose body was found in the creek area behind San Jose High School on Saturday, October 27, 1990.

"The victim drove a catering truck for his brother, Rubin, who was in the restaurant business. Gonzalo sold food, drinks, and cigarettes, driving a route which targeted various business locations. After finishing his shift around 9 p.m. Friday, October 26, Romero parked the catering truck at its warehouse/garage and drove his red Chrysler LeBaron convertible to Rubin's restaurant, where he turned over the day's proceeds. Gonzalo ordinarily withheld $100-$150 in coin and paper currency to be used as change the following day. He kept this money in a cash box; at the end of the business day, he would transfer the cash box to his own vehicle. He would also transfer to his own car the business's cigarette stock. This stock was typically replenished every evening after work and consisted of 10-15 cartons of cigarettes, each carton containing 10 packages. On this particular evening, Gonzalo was wearing a distinctive and expensive jeweled wristwatch.

---

[5] We quote the facts stated in this court's opinion in case No. H011204.

3

"Gonzalo spent several hours at his brother's restaurant during which time he drank a few beers and conversed with an acquaintance, Norberto Romero. At approximately 1:30 a.m., Gonzalo left for home; the cash box and cigarettes were in his car. Concerned that Gonzalo was either inebriated or too tired to drive, Norberto offered to drive Gonzalo home. Gonzalo declined the offer, but Norberto followed the victim out of concern for his safety. After turning onto 26th street, Gonzalo drove the Chrysler a block or so and then parked at the curb near the intersection of 26th and St. James. Norberto waited 20-30 minutes and then saw Gonzalo lie down inside the car. Norberto approached the Chrysler and saw that Gonzalo had fallen asleep. Believing Gonzalo would be safe, Norberto drove home at about 2:30 a.m.

"At approximately 7 a.m. Saturday morning, October 27, 1990, San Jose Police Officer Kevin Fagalde was dispatched to 208 North 26th Street on a report of suspicious circumstances. Upon his investigation, he saw large amounts of blood in and about the driveway, sidewalk, and curb. The officer discovered a concrete cinder block covered with blood and hair, as well as marks indicating that something or someone had been dragged through the blood. The evidence he observed caused him to conclude that a bloody struggle had occurred at the scene. Fagalde's partner, Daniel Archie, saw similar types of cinder blocks at a construction site across the street. He also noticed shoe prints on the dirt yard area adjoining the construction site.

"Gonz[a]lo's body was discovered later that morning about 9 a.m. by two teachers who had met at San Jose High School for a game of tennis. When they pulled into the school parking lot, they saw on the pavement a large pool of blood, a bloodied piece of white cloth, and a line of blood that looked like heel marks from a dragged body. While one teacher telephoned the police, the other followed the bloody heel marks into a nearby creek gully where she discovered the victim's body, which she described as 'a bloody white object.'

4

"Evidence at the 26th Street scene indicated that Gonzalo had been beaten with a cinder block and dragged up the driveway to a fence, down the driveway to the street and then along the street gutter.  Along the way, there were numerous blood spatters which indicated distinct beating sites.  Hair and 'medium velocity blood stains' were found on a cinder block at the scene.  The latter term applies where the blood spatters or radiates outward indicating that the loss of blood has been caused by force applied to the body rather than natural bleeding.  The cessation of drag marks in the gutter indicated that the body had been loaded into a car at that point; the quantity of blood demonstrated that Gonzalo was still alive when he was placed into the car.  Based on the amount of blood lost at the scene, however, investigating officers believed that only immediate hospitalization could have saved the victim's life.

"Police found two main areas of blood deposits at the high school indicative of two separate beating sites.  One of the sites contained a pool of liquid believed to have been urine.  Since urine is often released at time of death, it was theorized that this was where Gonzalo had died.  This theory was also supported by the absence of blood between this point and the final resting place of the body some 100 feet away in the creek gully.  The lack of blood is significant because large amounts of blood are deposited only when a circulatory system is functioning and can thus replenish blood supplies near the site of a wound.  A chunk of concrete found at the high school also contained medium velocity blood stains.

"Defendant had spent the previous evening with James Lankford, Rickie Fultz, and two other friends, one of whom was named Milton Paul.  After driving around for awhile, the men drove to a party across the street from the home of Lankford's girlfriend.  Lankford remained at the party when the other men drove to a fast food restaurant located at the intersection of King and Alum Rock.  Fultz left the restaurant around 1 a.m. and did not see defendant again until the following morning.

"At approximately 4 a.m., defendant rang the doorbell of Rita Franco's home at 244 North 26th street; Franco's home was located three to four houses away from the bloody crime scene. Defendant was a friend of Franco's son. When Franco told defendant everyone was asleep, he smiled, said, "okay," and then left. Franco did not notice anything unusual about defendant's manner or clothes. As defendant left, she saw him approach the sidewalk; Franco did not hear anything out of the ordinary that morning, nor did she hear any other voices or see anyone else in defendant's company.

"Lankford spent the night at his girlfriend's house near 33rd Street. While walking home the next morning, he saw defendant dragging a white object near San Jose High School. Defendant was alone. Defendant asked Lankford if he could get a change of clothes at Lankford's house and offered Lankford a ride. Afraid the red convertible defendant was driving might be stolen, Lankford declined the ride. Shortly after Lankford arrived home, however, defendant showed up with the red convertible. When the two men then drove to a McDonald's restaurant, Lankford noticed there were blood stains in the car.

"At approximately 8:30 a.m., Saturday morning, Lankford telephoned Fultz; the men then drove to Fultz's apartment. Lankford changed clothes at Fultz's house, a practice which was not unusual as he and Fultz were good friends and often 'swapped clothes back and forth.' Defendant also asked for a change of clothing. This was unusual since defendant had never kept any clothes at Fultz's house and he and Fultz were not in the habit of exchanging clothes. Fultz lent defendant a T-shirt and some socks. Fultz told defendant to put his dirty clothes in the closet, but instead defendant threw his socks into the garbage. The police later found a pair of socks and some shorts in the trash outside the apartment. The socks were splattered with the victim's medium velocity blood stains.

"At some point, Milton Paul also arrived at Fultz's apartment. Around 9:30 a.m., the four men drove off in the red convertible. As they left, Paul remarked that there was

6

blood in the car. Defendant replied that it was 'ketchup' and 'bird shit.' Fultz saw 'a bunch of boxes of cartons of cigarettes' inside the car in a small box. Lankford saw a cash box in the car, and also noticed that defendant was wearing a jeweled watch Lankford had never seen before. Later that morning, Fultz saw defendant selling packages of cigarettes at Roosevelt Park. Defendant said he had given a Mexican friend four rocks of cocaine in exchange for the car.

"Meanwhile, the police had secured the crime scene at the high school and were in the process of collecting evidence. At about 3:20 p.m. that afternoon, Roberta Wehrfritz and her husband were driving near the high school behind a red Chrysler convertible when they saw four young black men leap from the moving car. Defendant jumped over the bridge railing; Lankford and Fultz walked home after escaping from the car. The empty vehicle crashed into the concrete wall of the bridge which traversed the nearby creek; the vehicle came to a halt after striking a cyclone fence. Mrs. Wehrfritz later identified defendant as one of the individuals who had jumped from the car.

"Later that afternoon, Fultz approached an off-duty San Jose Police Officer who was working a security shift at San Jose Medical Center. By this time, Fultz believed defendant had stolen the car and was also fearful a murder might have been committed. Afraid he might be implicated in defendant's criminal conduct, Fultz told the officer about defendant and the car, including its appearance and contents. At that point, Wehrfritz was transported to the hospital where she identified Fultz as one of the men who had fled from the car. Later that afternoon, Fultz led the police to Lankford's house where Lankford was arrested.

"In the meantime, after observing the abandonment of the red convertible, police officers had begun a search along the creek bed and adjacent streets. Over a period of several hours, defendant led police officers on a lengthy chase. During this period, police received reports of numerous sightings from residents. At one point, defendant was discovered hiding underneath someone's bed and was chased by the occupant through the

7

streets into another home. The police eventually surrounded the home and entered with a pair of police dogs. When they did so, defendant jumped through a glass window after which he was attacked and bitten by a police dog. Defendant was then placed under arrest.

"Police found the victim's watch in defendant's pants pocket; they also found a package of cigarettes and one dime in defendant's possession. Defendant was not wearing socks or shoes. However, a pair of shoes later found in the creek area appeared to be the same size and to have the same ribbing pattern as those which caused the prints found in the blood. The shoes were similar to those which the defendant had been wearing. No blood was found on the shoes. However, if the perpetrator had run along a creek bed, fresh blood stains on the shoes would have been washed away by the water.

"An autopsy revealed that Gonzalo had been killed by numerous severe blows to the head. The blows were inflicted with a blunt instrument while the victim was still alive. The victim had sustained multiple skull fractures, had a gaping three-by-five-inch wound on the left side of his head, had suffered two-inch lacerations on his forehead and right eyebrow and had also sustained fractures to the jaw and teeth. The blunt instrument wounds were consistent with the use of a cinder block and pieces of concrete such as were found at the 26th Street scene and the high school.

"Gonzalo also had wide chest and back abrasions which were consistent with his having been dragged; these abrasions were inflicted while he was still alive. The autopsy also revealed numerous 'defense wounds' on the victim's arm and neck lacerations, both of which had been inflicted by a sharp instrument. These wounds were consistent with a drywall knife found at the 26th Street site. At the time of his death, the victim had a blood alcohol content of .10 percent.

"An examination of the Chrysler revealed blood stains on the passenger seat, door, console, and trunk. The blood stains demonstrated that the victim had been slumped in

8

the passenger seat, and had also been placed in the trunk. Some of these blood stains also contained hair. Blood on the wristwatch and knife matched that of the victim.

"Inside the car, officers found a metal cash box containing coins in the amount of $14.90; the rest of the money was missing. A wooden display box containing cigarette cartons was also found in the car along with a baggie of marijuana.

"The defense called several witnesses who lived near the 26th street scene and had heard the sound of a car and/or two or more people talking or arguing between midnight and 4 a.m. Saturday morning. One witness testified she heard someone yell, 'Let's take it to San Jose High.'

"After being individually questioned at the police station, defendant, Fultz, and Lankford were confined in or near the same jail cell. While in jail, Fultz heard Lankford complaining about the trouble they were in and asking why defendant had gotten him into that situation. Fultz overheard defendant tell Lankford that he had hit 'the guy' once with a brick but that 'Ice' had killed the victim; defendant went on to state that Lankford knew Ice. Fultz and Lankford testified they knew of no such person. Lankford's trial testimony was evasive. However, when pressed, he indicated defendant had said something about 'hit[ting] the man once with a rock, and somebody else [doing] the rest of the killing.' He remembered defendant saying something about kicking someone or something. Lankford testified that defendant fell asleep during the conversation.

"The police tried to locate 'Ice,' but were unable to find any such person."

### B. *Procedural History*

#### 1. Trial Proceedings

A jury convicted defendant of first degree felony murder, robbery, and kidnapping, finding true the felony-murder special circumstance allegations that the murder was committed during a robbery and a kidnapping and the allegation that defendant personally used a dangerous and deadly weapon, i.e., a knife, cinder block, and

9

pieces of concrete, during the commission of the murder and the robbery. The superior court sentenced defendant to life without the possibility of parole.

### 2. Direct Appeal

This court affirmed the judgment in 1994. Among other issues, this court determined that the trial court's failure to instruct the jury that the felony-murder special circumstance allegations, if predicated on an aiding and abetting theory, required a finding that defendant was a major participant in the underlying felony and acted with reckless indifference to human life was harmless beyond a reasonable doubt based on the "overwhelming evidence of defendant's guilt."

### 3. Former Section 1170.95 Proceedings

In 2021, defendant filed a former section 1170.95 petition in the superior court. As relevant here, the handwritten petition stated that "[a] complaint, information, and/or indictment was filed against [him] that allowed the prosecution to proceed under a theory of felony murder [or] under the natural and probable consequences doctrine"; "[a]t trial, [he] was convicted of first degree murder pursuant to the felony murder rule and/or the natural and probable consequences doctrine"; and he "could not now be convicted of first degree murder because of changes made to . . . sections 188 and 189, effective January 1, 2019." In addition, defendant stated that he was not the actual killer and the victim was not a peace officer in the performance of his or her duties. Defendant requested counsel.

The superior court denied the petition. Following this court's decision in *People v. Drayton* (2020) 47 Cal.App.5th 965, 975-976, overruled in part by *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*), the superior court performed an initial review to determine defendant's eligibility for relief before appointing counsel or requesting briefing. Relying on this court's opinion in the direct appeal, the superior court determined that defendant was ineligible for former section 1170.95 relief as a matter of law based on this court's finding that there was ample evidence that defendant participated in all aspects of the underlying crimes, was a major participant in the murder,

10

and acted with reckless indifference to human life such that the trial court's instructional error on the felony-murder special circumstance allegations was harmless beyond a reasonable doubt.

## II.  DISCUSSION

Defendant contends that the trial court erred in concluding that this court's 1994 conclusion that the jury's 1993 felony-murder special circumstance findings were valid precluded him from making a prima facie showing of eligibility for relief.  He further argues that the trial court erred by failing to appoint counsel and obtain briefing before denying his petition.  The Attorney General concedes that the trial court erred in denying the petition.

This court originally reversed the trial court's ruling, and the California Supreme Court granted review and held this case pending its decision in *Strong*, *supra*, 13 Cal.5th 698.  After the California Supreme Court issued *Strong*, it remanded this case for reconsideration in light of *Strong*.  Defendant filed a supplemental brief arguing that *Strong* requires reversal of the trial court's order, and the Attorney General conceded.  We conclude that the trial court's order must be reversed.

In *Strong*, the California Supreme Court held that a felony-murder special circumstance finding made prior to its decisions in *Banks* and *Clark* does not categorically preclude a defendant from making a prima facie showing of eligibility for relief under section 1172.6.  (*Strong*, *supra*, 13 Cal.5th at p. 720.)  "Section 1172.6 offers resentencing for petitioners who have not been determined beyond a reasonable doubt to have the degree of culpability now required for a murder, attempted murder, or manslaughter conviction.  Neither the jury's pre-*Banks* and *Clark* findings nor a court's later sufficiency of the evidence review amounts to the determination section 1172.6 requires, and neither set of findings supplies a basis to reject an otherwise adequate prima facie showing and deny issuance of an order to show cause." (*Ibid.*)

11

In this case, this court's 1994 conclusion that the jury's 1993 felony-murder special circumstance findings were valid occurred before the California Supreme Court's rulings in *Banks* and *Clark* in 2015 and 2016. Hence, neither this court's 1994 conclusion nor the jury's 1993 findings precluded defendant from making a prima facie showing in support of a section 1172.6 petition. (*Strong*, *supra*, 13 Cal.5th at p. 721.) Consequently, the trial court erred in denying defendant's petition on this basis.

### III.   DISPOSITION

The trial court's order is reversed, and the matter is remanded with directions to appoint counsel, consider issuing an order to show cause, and conduct further proceedings in accordance with Penal Code section 1172.6.

                                                _____
                                                BAMATTRE-MANOUKIAN, ACTING P.J.



WE CONCUR:




_____
LIE, J.




_____
WILSON, J.




*People v. Miller*
**H048932**